Good afternoon, Your Honors. I am Alan Sampson, the somewhat hungry attorney for petitioner. I do not expect to take up the full 20 minutes as I perceive this to be a one-issue case. Primarily, I believe that the issue, the primary issue, is the competence or incompetence of the translation and, if incompetent, whether the translation conterned facts which were tangential to or central to the immigration judge's determination that petitioner's testimony was not credible. Secondarily, whether, if incompetent, the translation may have affected the outcome of the proceedings. I perceive this case to be sort of an attempt to determine if there is a tipping point for an incompetent translation. In the instant case, I believe that the translation is incompetent and not only fulfills but exceeds the three standards articulated in the Perez-Laster decision. First standard being direct evidence of incorrectly translated words. The second standard being unresponsive answers by the witness. And the third standard being the witness's expression of any difficulty in understanding what is said to him. Now, the Board of Immigration Appeals backed up the immigration judge's decision that the petitioner was not credible and stated that there were only three examples of incompetent translation and that these three examples of incompetent translations did not go directly to the heart of the petitioner's case. I disagree respectfully. I've counted in going over the administrative record, I've counted six examples of incompetent translation, three of it, pardon me, three of which were directly on point with the, with important issues. I'm not sure of the answer to that. If those examples were not brought to the attention of the board, can we consider them? By that, do you mean that they were not raised by the attorney? Yeah, if the attorney in the brief to the BIA only cites to the three examples, the board looks at those three examples and rejects them on the grounds that they did, Has the petitioner exhausted with regard to the examples that you now urge us to examine? For my purposes here, I hope not, but I do believe nonetheless that the briefing attorney, and it was not me, the briefing attorney to the board, did cite at least two major examples of incompetence which went directly to the heart of whether petitioner was a credible witness, presented credible testimony or not credible testimony. I guess your argument, I think, if I can make it for you, would be that the fact that in the brief to the BIA there are only three examples selected sufficiently raises the issue so that it triggers an obligation on the part of the board to read the whole transcript. Yes. And look at all of the difficulties that were attended. That's correct. But the board did conclude in its own reading of the transcript that it could find only three nonessential mistranslations, as it were. I believe that at least that three of them were definitely essential. One of which concerned the issue of, quote, unquote, bundled items, which was probably a euphemism for hidden cocaine or marijuana or heroin. The second of which directly concerned that issue, what was the name of the drug found by the petitioner who was a customs agent in Mongolia. It was at various times referred to as white powder, another time as marijuana, another time as cocaine, completely muddling the translation because nobody appeared to know what the differences were between, in Mongolian at least, between the difference between cocaine and marijuana. What do we do with the fact that the asylum officer's interview, which used a different translator, your client said hashish? I believe that the petitioner provided his own translator at the asylum office interview. Obviously, you're stuck with who you have. So you're not challenging the competency of the translator that he supplied? I have no basis to challenge the competency of the translator, because I don't have a direct transcript of the interview at the asylum office. All we have are the asylum officer's notes, which may or may not have been correct. But nonetheless, the gravamen of the case is while the immigration judge has the obligation to consider the asylum officer's notes, the immigration judge and the board have the further obligation to consider the entire record in toto. Well, I'll tell you, counsel, what bothers me about this case is your client claims that he was employed as an inspector at the border, and that he had received three to four months of training to assist him in those duties, and that occasionally they found drugs that were being smuggled. And I recognize that there may not be specific Mongolian words for cocaine, hashish, and marijuana. That seems to be the gist of the transcript. But one would think that somebody employed to examine the luggage and cargo crossing the border who had been trained in doing that would know what different drugs look like. And the court certainly can take judicial notice, I think, of the fact that hashish looks very different from cocaine. And the IJ and the board both were troubled by the inconsistencies between what your client allegedly said to the asylum officer and what he said in his application and what he said in the hearing. I mean, that's kind of the classic basis for a determination. He was bouncing back and forth, and indeed at one point he responded to the judge's remark about cocaine and responded, yes, yes, that's cocaine, when it appeared in reading the transcript that he still didn't know the difference between cocaine and marijuana. Admittedly, he may have been an inspector, but it perhaps was more of the Inspector Clouseau variety than anything else. Yeah, but if he doesn't know the difference, that's a different sort of credibility problem. Part of my problem is triggering out whether he's testifying inconsistently or whether the translation is at one point translating marijuana as cocaine, at one point translating cocaine as marijuana. I mean, I don't have enough evidence to let me know that it's a mistranslation. It seems to me that what's in front of me suggests that he's just saying different things. Well, that's why the remedy that we propose is to remand the case back to the immigration judge for clarification of the translation. Well, before we do that, let's talk about the problem with the police uniform. Are you maintaining there was an error in the translation with regard to the color of the uniforms worn by Mongolian National Security Service officers, Mongolian police officers? I did not find any error in the translation pertaining to that or at least any proffered request or demand that an error was made. There was, however, a contradiction, a murkiness in the translation between whether the petitioner was released from the Mongolian National Detention Center after being detained there for some time. Before we get to did they book him at the police station before they took him to the jail, let's figure out who arrested him. And that was a concern to the immigration judge. And if you're not challenging the translation with regard to his description of the uniforms worn by the officers who arrested him, that's a problem for us. Indeed, at testimony he did say that he was arrested by the Mongolian police rather than by the Secret Service. He did state that there was some question as to what the uniforms worn by the people who entered into his apartment. And I don't, I'm not making the argument that there was any mistranslation of that. I didn't come across any. I had an understanding that the words for cocaine and marijuana are the same in English as well as Mongolian, much as if we watch the Spanish language, generally they refer to palm olive as palm olive in both English and Spanish. Is that correct? I believe so. That is indeed what the interpreter had difficulty with that. The interpreter had to tell the immigration judge that it was basically another word for cocaine and Mongolian. Not that I'm aware, either firsthand or secondhand. The interpreter did say, and I don't think you're challenging this interpretation, that he testified white powder at some point, right? Yes. He bounced back and forth between white powder and cocaine and marijuana and gave conflicting descriptions of whatever it was that he saw. But now I'm back to the problem that I asked you about earlier with regard to what he told the asylum officer what his interpreter were. It was hashish. He did, yes. I have no grounds to opine whether that was a mistranslation by his personally selected interpreter at the asylum office, or indeed usually translators there are listened into by professional translators from Washington to see if they're translating correctly. I don't have any grounds to opine whether that was done or not. I just hear from the government, and then we'll give you a minute in response. Thank you. May it please the Court. My name is Jesse Witten, and I represent the Attorney General, the Respondent. In this case, the record does not compel a finding that the petitioner was credible. Put another way, substantial evidence does support the IJ's and the BIA's determination. The translators' errors, that is, the errors of the translator at the immigration trial, do not go to any of the credibility facts. The translation errors that the petitioner has identified that have some bearing on the credibility issues were not errors by the translator at trial, but were if any but might have been errors by, according to him, by the individual retained to fill out the asylum application or by his wife at one point. I'd like to go through each of the three credibility issues and describe the testimony, the contradiction, and the explanation, if I could. I think that would be a helpful exercise. First, which drug was it? He testified white powder or cocaine at least six different places in the administrative record that that was the drug that was found in the packages that he inspected. He also testified that he knew from his training as a customs officer that cocaine is a white powder. That's at pages 155 and 163 of the administrative record. He also testified on pages 158 and 159 that he recalled being taught in his training what hashish looks like, but he didn't then recall what he had learned about the appearance of hashish. In his application, he wrote, or it is written in the application, of course he didn't write it, that there was a large consignment of hashish found. In the asylum officer's notes, he wrote, in the typed summary of the interview, he wrote that there were, quote, packages that appeared to be hashish. What is the explanation for this apparent contradiction that the petitioner gave at the immigration trial? He says that he told the application preparer that generically he found drugs, using the generic word for drugs, and that the application preparer wrote down hashish. This is at page 159 of the administrative record. He was asked by the immigration judge, well, what did you tell the asylum officer? This is your question, Judge Tolman, and he responded with, I do remember, I recall saying cocaine, maybe I didn't. That's on page 160 of the administrative record. He was given many chances to correct the application. On pages 64 and 65 of the administrative record, the immigration judge asked him to review the application and fix any changes. At the very same time, the IJ said, if there are any issues about credibility, I may wind up ruling against you. In other words, the petitioner was put on notice of the importance of making the corrections. Asked later in the trial why he did not correct that asylum application, the petitioner admitted that the application was read back to him in Mongolian, his language, but he did not give an answer as to why he didn't correct it. That's at pages 159 and 160 of the administrative record. The immigration judge couldn't have been clearer that she would like to have had an explanation for the anomalies. No translation error was responsible for no explanation being provided. Given all the conflicting evidence that was presented that I've described, there is substantial evidence for the IJ to have reached an adverse credibility decision. In fact, the IJ said that she didn't know what to believe. When an IJ doesn't know what to believe, according to this Court's decision in Chebchub, I think I'm pronouncing that correctly, and other decisions, when an immigration judge doesn't know what to believe based on all the evidence, that is itself substantial evidence to affirm an immigration judge. I'd like to move on to the second example, which is what law enforcement agency or security agency does not know what to believe. This is what law enforcement agency rated the home in October 2002. Testimony at the immigration trial. The petitioner testified he knows the difference between the local police and the National Security Service. He described the local police's function. He described the different colored uniforms. The local police wear a blue uniform, and the National Security Service wear a black-blue or dark-blue uniform. This is pages 168 to 170, and page 178 of the administrative record. He also testified that the four police officers showed up at his home, and two of them showed their IDs. So it wasn't just a matter of uniform. He was also shown, according to his testimony at the immigration trial, the actual police identification of two of the four. What did the application for asylum say? It referred to, quote, four officers of the Mongolian National Security, comma, a successor to the Soviet-era KGB. The asylum officer's summary, typed summary of interview, also referred to four Mongolian National Security officers. He was given the opportunity to explain this discrepancy by the immigration judge. His first answer on page 173 of the record was, I was nervous. His second answer, which was at page 173 and 174 of the administrative record, was to blame the application preparer. To have gotten it down wrong. His next answer, which occurred on pages 174 to 178 of the administrative record, was that whoever read back the application to him in his language Mongolian, which turns out to have been his wife, just said police, and didn't read all the words Mongolian National Security, a successor to the Soviet-era KGB. His wife testified on page 250 of the administrative record that, regarding discrepancies in general, it isn't clear if she was talking about this discrepancy, that their attorney told them not to bother correcting errors. Given all this testimony, the invitation by the immigration judge to explain the discrepancies, the lack of any explanation of the discrepancy, and the fact that the application was in Mongolian, it was clear that there was a discrepancy. In addition, which was not due to any kind of translation error, but other factors, the immigration judge had substantial evidence to reach an adverse credibility decision based on who it was who raided the home in October of 2002. Did I also read in the record that the wife was permitted to sit in the courtroom and listen to the testimony of her husband before she testified? Correct. That was a factor that the immigration judge gave in not crediting a different aspect of her testimony, that aspect being where she picked up the petitioner after he was released. So the third credibility issue, which is really related to the second, is where did he get taken by the police or the security officers, whoever it was? So this third issue, where was the petitioner taken? Trial testimony. He testified initially that he was taken to the police station. That's at pages 119 and 180. He says he was interrogated at the police station by two police officers who demanded essentially that he sign some sort of confession for being a drug dealer. That's at pages 119 to 120. The asylum application. He says that after the National Security Service officers raided his home, this is I think a quote from the asylum application, I was taken to the MNS's detention facility for the interrogation. Two officers, MNS officers presumably, I'm not quoting now, two officers were rude to him during that interrogation and forced him to sign a false confession. So he orally testifies at the trial that the police officers took him to the police station and it was police officers who got a false confession, whereas the asylum application says it was National Security officers who took him to the MNS facility and it was MNS officers who procured a false confession. What is his explanation? When asked to explain by the immigration judge, he said, well, first he was taken to the police station and then he was taken to the National Security Service detention facility where he was then released. Why the mistake? According to him, again, the person who filled out the application erred when writing down what he had told him. So the immigration judge asked, why didn't you fix this when I gave you that opportunity to fix? And the petitioner's response was, well, he didn't want to create any kind of confusion because the application said one thing and he didn't want to start creating contradictions. Again, this left the IJ not knowing what to believe. And the IJ also felt that it was evidence of a willingness to conform testimony to statements of others or statements in the prior documents. All this adds up to at least substantial evidence to support an adverse credibility decision. I'll also say this. This Court doesn't have to agree with the IJ or the Board on all of their determinations. Only one issue of adverse credibility is sufficient under this Court's precedent to compel an affirmance. Thank you. Thank you very much. Mr. Sampson, would you like a minute or so? Actually, you've got a lot longer, but my guess is you don't need all the time. Take whatever you need. I would maintain that the murkiness of the three important issues that I've mentioned, namely bundled items and the distinction between the police and the IJ, and the Mongolian National, Mongolian Secret Service, as well as the current name of whatever drug was found, establishes that there was a murky translation, and that a better translation would have placed the issue in a more realistic perspective. It was the translation which was responsible in large measure for the immigration of the IJ to Mongolia. It was the immigration judge's adverse credibility finding. She noted the discrepancies between petitioner's testimony at the individual hearing and his statements before the asylum officer, as well as his application for asylum. Admittedly, different terms were used in all three of these settings. He did refer to the Mongolian National Police, Mongolian National Detention Center at his asylum visit. He did not refer to the Mongolian police. He was nervous, as he stated. His wife tended to corroborate his testimony. The court has raised an interesting point about the immigration judge's statement that she would not give full corroborative value to his wife's testimony, because she was present while he was testifying. I have been unable to find any cases on point where less than full attention or less than full credence is paid to corroborative testimony, because the person was present while the primary petitioner was testifying. We have an evidence rule in federal court that specifically precludes witnesses from sitting in so that they can listen to the testimony of other people. The court has raised an interesting point about the immigration judge's statement that she would not give full corroborative value to his testimony, because he was present while the primary petitioner was testifying. The court has raised an interesting point about the immigration judge's statement that she would not give full corroborative value to his testimony, because he was present while the primary petitioner was testifying. Thank you.
judges: Fletcher, Tallman, Dawson